**BEACON PRODUCTS CORP., et al., Plaintiffs, Appellants,**

v.

**Ronald Wilson REAGAN, et al., Defendants, Appellees.**

**No. 86–1410.**

United States Court of Appeals, First Circuit.

Argued Nov. 7, 1986.

Decided March 11, 1987.

David Cole with whom Michael Ratner, Margaret Ratner, Peter Weiss, New York City, Center for Constitutional Rights, Jules Lobel, University of Pittsburgh, Franklin Siegel, Nat. Lawyers Guild, New York City, Jonathan Shapiro, Max Stern and Stern & Shapiro, Boston, Mass., were on brief, for plaintiffs, appellants.

Douglas Letter, Appellate Litigation Counsel, Appellate Staff, Civ. Div., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Washington, D.C., and William F. Weld, U.S. Atty., Boston, Mass., were on brief, for defendants, appellees.

Before COFFIN, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

Appellants are merchants who wish to trade with Nicaragua. They believe that the regulations prohibiting that trade, 31 C.F.R. Part 540, are legally invalid. Their argument rests upon what they perceive to be a critical legal flaw in the statutory scheme that authorizes the regulations. *See* National Emergencies Act (NEA), 50 U.S.C. §§ 1601–1651; International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1706.

IEEPA grants the President the power to prohibit trade in response to a foreign threat "if [he] declares a *national emergency* with respect to such threat." 50 U.S.C. § 1701(a) (emphasis added). The President may declare a "national emergency" only in accordance with procedures set forth in the NEA. But, when the President declared a national emergency with respect to Nicaragua, the NEA contained a "legislative veto" provision of a sort held unconstitutional in *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

Appellants argued before the district court that this unconstitutional legislative veto provision (allowing Congress to terminate national emergencies by congressional resolution) destroyed the legal efficacy of the NEA, invalidated the "national emergency," and thereby deprived the trade regulations of necessary statutory authority. They asked the court to declare the emergency and the regulations invalid.

The government agreed that the legislative veto provision was unconstitutional. But, it argued that the veto provision was "severable" from the rest of the National Emergencies Act. In its view, the remainder of the NEA continued to have legal effect. Hence the national emergency was valid, and the regulations should stand.

Like most courts that have considered "severability" questions after *Chadha*, the district court agreed with the government and held that the legislative veto clause was severable from the rest of the statute. *Cf. Alaska Airlines v. Donovan*, 766 F.2d 1550, 1559–65 (D.C.Cir.1985) (section 43 of the Airline Deregulation Act of 1978), *cert. granted*, —— U.S. ——, 106 S.Ct. 1259, 89 L.Ed.2d 569 (1986); *Gulf Oil Corp. v. Dyke*, 734 F.2d 797, 802–05 (Temp.Emer.Ct. App.) (Emergency Petroleum Allocation Act and Energy Policy and Conservation

Act), *cert. denied,* 469 U.S. 852, 105 S.Ct. 173–74, 83 L.Ed.2d 108 (1984); *EEOC v. Hernando Bank, Inc.,* 724 F.2d 1188, 1190–92 (5th Cir.1984) (Reorganization Act of 1977); *Allen v. Carmen,* 578 F.Supp. 951, 968–71 (D.D.C.1983) (section 104 of the Presidential Recordings and Materials Preservation Act). *But cf. City of New Haven v. United States,* 809 F.2d 900, 904–09 (D.C.Cir.1987) (holding that the challenged portion of section 1013 of the Impoundment Control Act of 1974 is so bound up in the whole scheme of section 1013 that the rest of the section cannot stand independently); *EEOC v. CBS, Inc.,* 743 F.2d 969, 971–74 (2d Cir.1984) (same in regard to Reorganization Act of 1977). Appellants seek reversal of the district court decision, 633 F.Supp. 1191 (1986). We cannot appropriately consider their basic legal claim, however, and, since we reject their subsidiary claim, we affirm the district court's judgment.

## I

■ We cannot review the district court's decision about severability because the issue has become moot. The President initially declared a national emergency, following the procedures set forth in the National Emergencies Act, on May 1, 1985. *See* Exec. Order No. 12,513, 3 C.F.R. 342 (1985). At that time, the NEA contained a legislative veto clause. In August 1985, however, Congress amended the NEA and replaced the unconstitutional clause with a constitutional counterpart. *See* Act of Aug. 16, 1985, Pub.L. 99–93, § 801, 99 Stat. 448 (1985) (amending section 202(a)(1) of the NEA to provide for termination by joint resolution, which requires the President's signature, instead of by concurrent resolution, which does not). Then, on April 22, 1986, just a few days before the district court issued its decision in this case, the President notified Congress that he was continuing the state of emergency under the now-amended statute, which the parties concede is constitutionally valid. *See* 51 Fed.Reg. 15,461 (1986). This "notice," in our view, redeclared the national emergency. The regulations therefore have adequate statutory support.

Appellants resist the proposition that their claim is moot by arguing that the President's April 1986 notice to Congress was not legally sufficient to redeclare a national emergency. They note that the April document says on its face that it is a *"[c]ontinuation"* of an emergency (emphasis added); it does not say that it *"declares"* an emergency. But, it seems to us that this is a distinction without a difference. The formal statutory requirements for declaring and for continuing an emergency are the same: notice, transmission of the notice to Congress, and publication in the Federal Register. *Compare* 50 U.S.C. § 1621(a) (prescribing procedures for declaring an emergency) *with* 50 U.S.C. § 1622(d) (prescribing procedures for continuing an emergency). Both Presidential notices complied with these requirements. Moreover, the second notice cross-referenced the first.

Both notices also satisfied the more substantive requirements specified in the International Emergency Economic Powers Act, which empowers the President to impose restrictions on trade if a national emergency is in effect. IEEPA requires the President to tell Congress:

(1) the circumstances which necessitate such exercise of authority;

(2) why the President believes those circumstances constitute an unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States;

(3) the authorities to be exercised and the actions to be taken in the exercise of those authorities to deal with those circumstances;

(4) why the President believes such actions are necessary to deal with those circumstances; and

(5) any foreign countries with respect to which such actions are to be taken and why such actions are to be taken with respect to those countries.

50 U.S.C. § 1703(b). In the case of the original declaration of emergency issued in

May 1985, the President satisfied these five requirements by sending to Congress an accompanying message that set forth his reasons for declaring an emergency. *See* 21 Weekly Comp.Pres.Doc. 567 (May 1, 1985). In the case of his notice continuing the emergency issued in April 1986, he satisfied these requirements by sending a similar message. *See* 22 Weekly Comp. Pres.Doc. 519–20 (Apr. 22, 1986). The second message referred to the first and noted that the "emergency situation" that prompted the President to take action in 1985 "has not eased." *Id.*

We have printed both presidential notices and messages in an appendix to this opinion. We can find no significant difference between them in terms of declaring the President's intent, explaining the President's reasons, or giving Congress effective notice. We have found nothing in the relevant statutes that would lead us to conclude that the use of the word "continuation" in the second notice rather than the word "declaration" was meant to have or has any legal significance. Rather, its use in all likelihood simply reflects the fact that the President had already issued under the unamended statute an emergency declaration that might have been legally valid. We see no reason in these circumstances to elevate form over substance by making significant the distinction between "continuation" and "declaration."

Thus, if the first notice was sufficient to create an emergency, so was the second. And, since that second notice was promulgated under the authority of a (concededly) constitutional statute, appellants' basic legislative veto claim is moot.

## II

Appellants make a second argument, which is not moot. They point to section 202(b) of the NEA, which states:

> Not later than six months after a national emergency is declared, and not later than the end of each six-month period thereafter that such emergency continues, each House of Congress shall meet to consider a vote on a joint resolution to

determine whether that emergency shall be terminated.

50 U.S.C. § 1622(b). The parties agree that Congress has not met "to consider a vote on a joint resolution" to determine whether to terminate the emergency declared with respect to Nicaragua. Appellants say that because more than six months have passed since the emergency was declared, the emergency automatically terminates.

■ The legal question appellants raise is what remedy, if any, the NEA supplies for Congressional inaction that violates this 'periodic meeting' clause. They suggest that the NEA implicitly provides that a validly declared national emergency will automatically terminate if Congress fails to "meet to consider a vote" about whether the emergency will terminate. We disagree for the following reasons. First, section 202(b) says nothing about automatic termination. Yet, a nearby provision, section 202(d), 50 U.S.C. § 1622(d), explicitly states that an emergency will terminate if the President fails to extend it. This contrast, in two virtually adjoining subsections of the statute, suggests that Congress focused on the issue and deliberately chose not to provide for automatic termination in Section 202(b).

Second, in 1974 Congress specifically eliminated from an earlier proposed version of the NEA a provision that said that emergencies would automatically expire after six months unless Congress acted to extend them. It substituted the present form of section 202(b), which says that Congress must *pass a resolution* to end an emergency. *See* 120 Cong.Rec. 34,011–12 (1974). This legislative history makes clear that Congress intended to impose upon itself the burden of acting affirmatively to end an emergency. To interpret the NEA to call for automatic termination, as appellants would have us do, would take that burden from Congress.

Third, to read section 202(b) as providing for automatic termination if Congress fails to vote would create an anomaly. Failure to vote likely means that few legislators wish to end the emergency. It would be

odd to think that Congress would make it easier to terminate a popular emergency than an unpopular one. It seems far more likely that Congress meant the "shall meet to consider a vote" language to give those who want to end the emergency the chance to force a vote on the issue, rather than to *require* those who do *not* want to end the emergency to force congressional action to prevent automatic termination.

In sum, the major issue appellants seek to raise is moot. Their subsidiary argument, although not moot, is not convincing. Therefore, the judgment of the district court is

*Affirmed.*

### APPENDIX

**Executive Order 12513 of May 1, 1985**

**Prohibiting Trade and Certain Other Transactions Involving Nicaragua**

By the authority vested in me as President by the Constitution and laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), chapter 12 of Title 50 of the United States Code (50 U.S.C. 191 *et seq.*), and section 301 of Title 3 of the United States Code,

I, RONALD REAGAN, President of the United States of America, find that the policies and actions of the Government of Nicaragua constitute an unusual and extraordinary threat to the national security and foreign policy of the United States and hereby declare a national emergency to deal with that threat.

I hereby prohibit all imports into the United States of goods and services of Nicaraguan origin; all exports from the United States of goods to or destined for Nicaragua, except those destined for the organized democratic resistance, and transactions relating thereto.

I hereby prohibit Nicaraguan air carriers from engaging in air transportation to or from points in the United States, and transactions relating thereto.

In addition, I hereby prohibit vessels of Nicaraguan registry from entering into United States ports, and transactions relating thereto.

The Secretary of the Treasury is delegated and authorized to employ all powers granted to me by the International Emergency Economic Powers Act to carry out the purposes of this Order.

The prohibitions set forth in this Order shall be effective as of 12:01 a.m., Eastern Daylight Time, May 7, 1985, and shall be transmitted to the Congress and published in the **Federal Register.**

RONALD REAGAN

THE WHITE HOUSE,
*May 1, 1985.*

*Message to the Congress on U.S. Actions. May 1, 1985*

*To the Congress of the United States:*

Pursuant to section 204(b) of the International Emergency Economic Powers Act, 50 U.S.C. 1703, I hereby report to the Congress that I have exercised my statutory authority to declare a national emergency and to prohibit: (1) all imports into the United States of goods and services of Nicaraguan origin; (2) all exports from the United States of goods to or destined for Nicaragua except those destined for the organized democratic resistance; (3) Nicaraguan air carriers from engaging in air transportation to or from points in the United States; and (4) vessels of Nicaraguan registry from entering into United States ports.

These prohibitions will become effective as of 12:01 a.m., Eastern Daylight Time, May 7, 1985.

I am enclosing a copy of the Executive Order that I have issued making this declaration and exercising these authorities.

1. I have authorized these steps in response to the emergency situation created by the Nicaraguan Government's aggressive activities in Central America. Nicaragua's continuing efforts to subvert its neighbors, its rapid and destabilizing military buildup, its close military and security

APPENDIX—Continued

ties to Cuba and the Soviet Union and its imposition of Communist totalitarian internal rule have been described fully in the past several weeks. The current visit by Nicaraguan President Ortega to Moscow underscores this disturbing trend. The recent rejection by Nicaragua of my peace initiative, viewed in the light of the constantly rising pressure that Nicaragua's military buildup places on the democratic nations of the region, makes clear the urgent threat that Nicaragua's activities represent to the security of the region and, therefore, to the security and foreign policy of the United States. The activities of Nicaragua, supported by the Soviet Union and its allies, are incompatible with normal commercial relations.

2. In taking these steps, I note that during this month's debate on U.S. policy toward Nicaragua, many Members of Congress, both supporters and opponents of my proposals, called for the early application of economic sanctions.

3. I have long made clear that changes in Sandinista behavior must occur if peace is to be achieved in Central America. At this time, I again call on the Government of Nicaragua:

- to halt its export of armed insurrection, terrorism, and subversion in neighboring countries;
- to end its extensive military relationship with Cuba and the Soviet Bloc and remove their military and security personnel;
- to stop its massive arms buildup and help restore the regional military balance; and
- to respect, in law and in practice, democratic pluralism and observance of full political and human rights in Nicaragua.

4. U.S. application of these sanctions should be seen by the Government of Nicaragua, and by those who abet it, as unmistakable evidence that we take seriously the obligation to protect our security interests and those of our friends. I ask the Government of Nicaragua to address seriously the concerns of its neighbors and its own opposition and to honor its solemn commitments

to non-interference, non-alignment, respect for democracy, and peace. Failure to do so will only diminish the prospects for a peaceful settlement in Central America.

Ronald Reagan

The White House,
May 1, 1985.

**Notice of April 22, 1986**

**Continuation of Nicaraguan Emergency**

On May 1, 1985, by Executive Order No. 12513, I declared a national emergency to deal with the threat to the national security and foreign policy of the United States constituted by the actions and policies of the Government of Nicaragua. Because those actions and policies continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States, the national emergency declared on May 1, 1985, must continue in effect beyond May 1, 1986. Therefore, in accordance with Section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d) ), I am continuing the national emergency with respect to Nicaragua. This notice shall be published in the Federal Register and transmitted to the Congress.

/s/ Ronald Reagan

THE WHITE HOUSE,
*April 22, 1986.*

*Message to the Congress. April 22, 1986*

*To the Congress of the United States:*

Section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d) ) provides for the automatic termination of a national emergency unless, prior to the anniversary date of its declaration, the President publishes in the *Federal Register* and transmits to the Congress a notice stating that the emergency is to continue in effect beyond the anniversary date. In accordance with this provision, I have sent the enclosed notice, stating that the Nicaraguan emergency is to continue in effect beyond May 1, 1986, to the *Federal Register* for publication.

The emergency situation created by the Nicaraguan Government's aggressive ac-

APPENDIX—Continued

tivities in Central America has not eased since the declaration of the Nicaraguan emergency on May 1, 1985, nor has the Government of Nicaragua responded to my call for actions appropriate to achieving peace in Central America as contained in my message to the Congress accompanying that declaration. In these circumstances, I have determined that it is necessary to continue in effect the national emergency with respect to Nicaragua after May 1, 1986, in order to deal with this unusual and extraordinary threat to the national security and foreign policy of the United States.

**Ronald Reagan**

The White House,
April 22, 1986.