UNIVERSAL CITY STUDIOS,
INC, et al., Plaintiffs,

v.

Shawn C. REIMERDES,
et al., Defendants.

No. 00 Civ. 0277(LAK).

United States District Court,
S.D. New York.

Feb. 2, 2000.

Leon P. Gold, Jon Baumgarten, William M. Hart, Kenneth Rubenstein, Prosakuer Rose LLP, for plaintiffs.

Peter L. Katz, Robin D. Gross, Allonn E. Levy, Huber & Samuelson PC, for defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This case is another step in the evolution of the law of copyright occasioned by advances in technology. Plaintiff motion picture studios brought this action to enjoin defendants from providing a computer program on their Internet Web sites that permits users to decrypt and copy plaintiffs' copyrighted motion pictures from digital versatile disks ("DVDs"). They rely on the recently enacted Digital Millennium Copyright Act ("DMCA").[1]

On January 20, 2000, the Court granted plaintiffs' motion for a preliminary injunction and indicated that this opinion would follow.

### Facts

Plaintiffs in this case are eight major motion picture studios which are engaged in the business of producing, manufacturing and/or distributing copyrighted and copyrightable material, including motion pictures. Motion pictures usually are first released for theatrical distribution and la-

---

1. 17 U.S.C. § 1201 *et seq.*

ter to consumers in "home video" formats such as videotape, laserdisc and, most recently, DVD.

*DVDs*

DVDs are five-inch wide discs that, in this application, hold full-length motion pictures. They are the latest technology for private home viewing of recorded motion pictures. This technology drastically improves the clarity and overall quality of a motion picture shown on a television or computer screen.

*CSS*

DVDs contain motion pictures in digital form, which presents an enhanced risk of unauthorized reproduction and distribution because digital copies made from DVDs do not degrade from generation to generation. Concerned about this risk, motion picture companies, including plaintiffs, insisted upon the development of an access control and copy prevention system to inhibit the unauthorized reproduction and distribution of motion pictures before they released films in the DVD format. The means now in use, Content Scramble System or CSS, is an encryption-based security and authentication system that requires the use of appropriately configured hardware such as a DVD player or a computer DVD drive to decrypt, unscramble and play back, but not copy, motion pictures on DVDs. CSS has been licensed to hundreds of DVD player manufacturers and DVD content distributors in the United States and around the world.

CSS has facilitated enormous growth in the use of DVDs for the distribution of copyrighted movies to consumers. DVD movies first were introduced in the United States in 1996. Over 4,000 motion pictures now have been released in that format in the United States, and movies are being issued on DVDs at the rate of over 40 new titles per month in addition to rereleases of classic films. More than 5 million DVD players have been sold, and DVD disc sales now exceed one million units per week.

*DeCSS*

In October 1999, an individual or group, believed to be in Europe, managed to "hack" CSS [2] and began offering, via the Internet, a software utility called DeCSS that enables users to break the CSS copy protection system and hence to make and distribute digital copies of DVD movies.

The Motion Picture Association of America ("MPAA") almost immediately acted under the provisions of the DMCA by demanding that Internet service providers remove DeCSS from their servers and, where the identities of the individuals responsible were known, that those individuals stop posting DeCSS. These efforts succeeded in removing a considerable share of the known postings of DeCSS.

On December 29, 1999, the licensor of CSS, DVD CCA, commenced a state court action in California for the misappropriation of its trade secrets as embodied in the DeCSS software. On the same day, the state court judge without explanation denied the plaintiff's motion for a temporary restraining order.[3] Members of the hacker community then stepped up efforts to distribute DeCSS to the widest possible audience in an apparent attempt to preclude effective judicial relief. One individual even announced a contest with prizes (copies of DVDs) for the greatest number of copies of DeCSS distributed, for the most elegant distribution method, and for the "lowest tech" method.

*Defendants*

Defendants each are associated with Web sites that were distributing DeCSS at

---

**2.** Recent reports indicate that Norwegian police have arrested an individual said first to have hacked CSS. *See* Mike Godwin, *Teen Co-Creator of DVD Decryption Program Arrested at Norwegian Home,* E–Commerce Law Weekly, Feb. 2, 2000.

**3.** The same court reportedly granted the plaintiff's motion for a preliminary injunction following the decision in this case.

the time plaintiffs moved for injunctive relief. Internet registry information indicates that defendant Shawn Reimerdes owns and is the administrative, technical and billing contact for a Web site bearing the domain name dvd-copy.com. Defendant Roman Kazan is listed as the technical contact for krackdown.com and the technical, administrative and zone contact for escape.com, which are registered to Krackdown and Kazan Corporation, respectively. Defendant Eric Corley, a/k/a Emmanuel Goldstein, is similarly listed for a Web site with the domain name 2600.com, registered to 2600 Magazine. None of the defendants submitted any evidence in opposition to the motion, and the Court in all the circumstances infers that each personally has been involved in providing and distributing DeCSS over the Internet via these Web sites.

## Discussion

In order to obtain a preliminary injunction, the movant must show "(a) irreparable harm, and (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in its favor." [4]

### A. *Irreparable Injury*

 The requirement of immediate and irreparable injury is satisfied in this case. Copyright infringement is presumed to give rise to such harm.[5] In this case, plaintiffs do not allege that defendants have infringed their copyrights, but rather that defendants offer technology that circumvents their copyright protection system and thus facilitates infringement. For purposes of the irreparable injury inquiry, this is a distinction without a difference. If plaintiffs are correct on the merits, they face substantially the same immediate and irreparable injury from defendants' posting of DeCSS as they would if defendants were infringing directly. Moreover, just as in the case of direct copyright infringement, the extent of the harm plaintiffs will suffer as a result of defendants' alleged activities cannot readily be measured, suggesting that the injury truly would be irreparable.[6]

### B. *Likelihood of Success*

Plaintiffs' sole claim is for violation of the anti-circumvention provisions of the DMCA. They contend that plaintiffs' posting of DeCSS violates Section 1201(a)(2) of the statute, which prohibits unauthorized offering of products that circumvent technological measures that effectively control access to copyrighted works. Defendants respond that (1) they have been named improperly as defendants, (2) the posting

**4.** *Richard Feiner & Co. v. Turner Ent. Co., MGM/UA*, 98 F.3d 33, 34 (2d Cir.1996) (citing *inter alia Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam)).

**5.** *See Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.*, 25 F.3d 119, 124 (2d Cir.1994).

**6.** Defendants suggest that plaintiffs delayed bringing this action, thereby undermining their claim of irreparable injury. Although undue delay in some circumstances can defeat a presumption of irreparable injury, *see Markowitz Jewelry Co., Inc. v. Chapal/Zenray, Inc.*, 988 F.Supp. 404, 406 (S.D.N.Y.1997), that is so only where the delay is unexplained and unjustified. If a party is unaware at the outset of the scope of the threat or pursues with reasonable dispatch other means to remedy the problem without coming to court,

there is no undue delay. *See Gilliam v. American Broadcasting Companies, Inc.*, 538 F.2d 14, 25 (2d Cir.1976). In this case, plaintiffs first learned of the appearance of DeCSS on the Internet in late October 1999. Schumann Decl. ¶ 10; Attaway Decl. ¶ 7. Plaintiffs immediately sought to address the problem by approaching Internet service providers and met with some success. Attaway Decl. ¶ 8. After a state court in California declined to issue a temporary restraining order in a case involving misappropriation of trade secrets on December 29, 1999, the dissemination of DeCSS became more widespread. Attaway Decl. ¶ 9. As this motion was brought by order to show cause on January 14, 2000, the Court finds that plaintiffs acted with reasonable speed and that any delay was not undue.

of DeCSS falls within one of the DMCA exceptions and is not illegal under the statute, (3) application of the DMCA to prohibit posting of DeCSS violates defendants' First Amendment rights, and (4) a preliminary injunction would constitute an unlawful prior restraint on protected speech.

### 1. Defendants Are Properly Named

▮▮▮ Defendants contend that plaintiffs' claim against all three defendants must be dismissed because defendants are not the owners of the Web sites containing the offending material and therefore are not the "real parties in interest." They rely on Rule 17 of the Federal Rules of Civil Procedure.[7]

In relevant part, Federal Rule 17 states that "[e]very action shall be *prosecuted* in the name of the real party in interest."[8] This rule does not apply to defendants, as they are not prosecuting this action. Further, whether defendants own the Web sites at issue is not dispositive of anything. Plaintiffs claim that defendants' conduct violates the DMCA. If plaintiffs make such a showing, they will win on the merits. If they fail, defendants will be absolved of liability. As defendants have failed to submit affidavits or other materials indicating that they had nothing to do with the offending Web sites, the Court infers from the evidence before it, for the purpose of this motion, that they are responsible for the content of the sites. Of course, plaintiffs will bear the burden of proof on this issue at trial.[9]

### 2. DMCA Violation

▮▮▮ Section 1201(a)(2) of the Copyright Act, part of the DMCA, provides that:

"No person shall ... offer to the public, provide or otherwise traffic in any technology ... that—

"(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under [the Copyright Act];

"(B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under [the Copyright Act]; or

"(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under [the Copyright Act]."[10]

"[C]ircumvent a technological measure" is defined to mean descrambling a scrambled work, decrypting an encrypted work, or "otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner."[11] The statute explains further that "a technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information or a process or a treatment, with the authority of the copyright owner, to gain access to a work."[12]

Here, it is perfectly clear that CSS is a technological measure that effectively controls access to plaintiffs' copyrighted movies because it requires the application of information or a process, with the authority of the copyright owner, to gain access to

---

7. FED.R.CIV.P. 17.

8. Emphasis added.

9. Defendant Roman Kazan argues also that, since this action was filed, DeCSS has been removed from the Web site that he allegedly controls. This does not moot the claim against him. *See United States v. W.T. Grant,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

10. 17 U.S.C. § 1201(a)(2). *See also* 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER, ON COPYRIGHT ("NIMMER") § 12A.03[1][*a*], at 12A–16 (1999).

11. 17 U.S.C. § 1201(a)(3)(A).

12. *Id.* § 1201(a)(3)(B).

those works. Indeed, defendants conceded in their memorandum that one cannot in the ordinary course gain access to the copyrighted works on plaintiffs' DVDs without a "player key" issued by the DVD CCA that permits unscrambling the contents of the disks.[13] It is undisputed also that DeCSS defeats CSS and decrypts copyrighted works without the authority of the copyright owners. As there is no evidence of any commercially significant purpose of DeCSS other than circumvention of CSS, defendants' actions likely violated Section 1201(a)(2)(B). Moreover, although defendants contended at oral argument that DeCSS was not designed primarily to circumvent CSS, that argument is exceptionally unpersuasive.[14] In consequence, plaintiffs have an extremely high likelihood of prevailing on the merits unless defendants' activities come within one of the exceptions in the DMCA or unless there is a constitutional impediment to this conclusion.

Defendants contend that their activities come within several exceptions contained in the DMCA and the Copyright Act and constitute fair use under the Copyright Act. They are unlikely to prevail on any of these contentions.

### a. Service Provider Exception

█ Defendant Roman Kazan alone argues that his conduct falls under Section 512(c) of the Copyright Act,[15] which provides limited protection from liability for copyright infringement by certain service providers for information resident on a system or network owned or controlled by them.[16] This argument fails for several reasons.

First, Mr. Kazan offered no proof that he is a service provider within the meaning of Section 512(c).[17] But that point ultimately is unnecessary to the result.

Section 512(c) provides protection only from liability for copyright infringement.[18] Plaintiffs seek to hold defendants liable not for copyright infringement, but for a violation of Section 1201(a)(2), which applies only to circumvention products and technologies. Section 512(c) thus does not apply here.

### b. Reverse Engineering Exception

█ Defendants claim also to fall under Section 1201(f) of the statute, which provides that, notwithstanding Section 1201(a)(2)—

"a person who has lawfully obtained the right to use a copy of a computer program may circumvent a technological measure that effectively controls access to a particular portion of that program for the sole purpose of identifying and analyzing those elements of the program

"circumvent a technological measure" that effectively controls access to a copyrighted work and violate the statute in any case.

**15.** 17 U.S.C. § 512(c).

**16.** Def.Mem. at 6–7.

**17.** 17 U.S.C. § 512(k) ("[T]he term 'service provider' means a provider of online services or network access, or the operator of facilities therefore, and includes an entity" "offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a users, of material of the user's choosing, without modification to the content of the material as sent or received.").

**18.** *Id.* § 512(c)(1).

---

**13.** Def.Mem. at 3.

**14.** Defendants contended that DeCSS was intended only to permit persons in lawful possession of copyrighted disks to play them for their own use on computers running under the Linux operating system rather than Windows. Tr. at 28. Indeed, they suggested that this is the only possible use of DeCSS and that DeCSS does not permit the user to copy DVDs. *Id.* at 28–30. But the arguments are unpersuasive for two reasons.

First, defendants have submitted no evidence—as distinguished from unsubstantiated assertions at oral argument—to support these contentions. Second, even if DeCSS were intended and usable solely to permit the playing, and not the copying, of DVDs on Linux machines, the playing without a licensed CSS "player key" would

that are necessary to achieve interoperability of an independently created computer program with other programs . . . to the extent that any such acts of identification and analysis do not constitute infringement under this title." [19]

They contend that DeCSS is necessary to achieve interoperability between computers running on the Linux system and DVDs and that this exception therefore is satisfied.[20] This contention fails for three reasons.

First, defendants have offered no evidence to support this assertion.

Second, even assuming that DeCSS runs under Linux, it concededly runs under Windows—a far more widely used operating system—as well. It therefore cannot reasonably be said that DeCSS was developed "for the sole purpose" of achieving interoperability between Linux and DVDs.

Finally, and most important, the legislative history makes it abundantly clear that Section 1201(f) permits reverse engineering of copyrighted computer programs only and does not authorize circumvention of technological systems that control access to other copyrighted works, such as movies.[21] In consequence, the reverse engineering exception does not apply.

### c. Encryption Research

 Section 1201(g) provides in relevant part that:

"Notwithstanding the provisions of subsection (a)(2), it is not a violation of that subsection for a person to—

"(A) develop and employ technological means to circumvent a technological measure for the sole purpose of that person performing the acts of good faith encryption research described in paragraph (2); and

"(B) provide the technological means to another person with whom he or she is working collaboratively for the purpose of conducting the acts of good faith encryption research described in paragraph (2) or for the purpose of having that other person verify his or her acts of good faith encryption research described in paragraph (2)." [22]

Paragraph (2) in relevant part permits circumvention of technological measures in the course of good faith encryption research if:

"(A) the person lawfully obtained the encrypted copy, phonorecord, performance, or display of the published work;

"(B) such act is necessary to conduct such encryption research;

"(C) the person made a good faith effort to obtain authorization before the circumvention; and

"(D) such act does not constitute infringement under this title. . . ." [23]

In determining whether one is engaged in good faith encryption research, the Court is instructed to consider factors including whether the results of the putative encryption research are disseminated in a manner designed to advance the state of knowledge of encryption technology versus facilitation of copyright infringement, whether the person in question is engaged in legitimate study of or work in encryption, and whether the results of the research are communicated in a timely fashion to the copyright owner.[24]

There has been a complete failure of proof by defendants on all of these factors. There is no evidence that any of them is engaged in encryption research, let alone good faith encryption research. It appears that DeCSS is being distributed in a manner specifically intended to facilitate

**19.** 17 U.S.C. § 1201(f)(1).

**20.** Def.Mem. at 8–9.

**21.** S.Rep. No. 105–190 (1998); H.R.Rep. 105–551(II) (1998).

**22.** 17 U.S.C. § 1201(g)(4).

**23.** *Id.* § 1201(g)(2).

**24.** *Id.* § 1201(g)(3).

copyright infringement. There is no evidence that defendants have made any effort to provide the results of the DeCSS effort to the copyright owners. Surely there is no suggestion that any of them made a good faith effort to obtain authorization from the copyright owners. Accordingly, plaintiffs are likely to prevail in their contention that defendants' activities are not protected by Section 1201(g).

#### d. Security testing

█ Defendants contend also that their actions should be considered exempt security testing under Section 1201(j) of the statute.[25] This exception, however, is limited to "assessing a computer, computer system, or computer network, solely for the purpose of good faith testing, investigating, or correcting [of a] security flaw or vulnerability, with the authorization of the owner or operator of such computer system or computer network." [26]

The record does not indicate that DeCSS has anything to do with testing computers, computer systems, or computer networks. Certainly defendants sought, and plaintiffs' granted, no authorization for defendants' activities. This exception therefore has no bearing in this case.

#### e. Fair use

█ Finally, defendants claim that they are engaged in a fair use under Section 107 of the Copyright Act.[27] They are mistaken.

Section 107 of the Act provides in critical part that certain uses of copyrighted works that otherwise would be wrongful are "not … infringement[s] of copyright." [28] Defendants, however, are not here sued for copyright infringement. They are sued for offering to the public and providing technology primarily designed to circumvent technological measures that control access to copyrighted works and otherwise violating Section 1201(a)(2) of the Act. If Congress had meant the fair use defense to apply to such actions, it would have said so.

#### 3. Constitutionality of DMCA

Defendants contend that the DeCSS computer program is protected speech and that the DMCA, at least insofar as it purports to prohibit the dissemination of DeCSS to the public, violates the First Amendment.

As a preliminary matter, it is far from clear that DeCSS is speech protected by the First Amendment. In material respects, it is merely a set of instructions that controls computers.[29] Courts that have considered the question whether program code is constitutionally protected expression have divided on the point.[30] Nev-

---

25. Def.Mem. at 11–12.

26. *Id.* § 1201(j)(1).

27. Def.Mem. at 12. *See* 17 U.S.C. § 107.

28. 17 U.S.C. § 107.

29. Defendants asserted at oral argument that DeCSS, or some versions of it, contain programmer's comments, "which are non-executable appendages to lines of executable code." *Tradescape.com v. Shivaram,* 77 F.Supp.2d 408, 418 (S.D.N.Y. 1999). Such comments are protected by the First Amendment. Plaintiffs, however, have disclaimed any effort to restrain dissemination of programmer comments as distinguished from executable code.

30. *Compare Bernstein v. United States Dept. of Justice,* 176 F.3d 1132, 1141 (holding that encryption software in source code form is constitutionally protected expression but expressing no opinion with respect to object code), *rehearing in banc granted, opinion withdrawn,* 192 F.3d 1308 (9th Cir.1999); *with Junger v. Daley,* 8 F.Supp.2d 708, 715–18 (N.D.Ohio 1998) (holding that encryption software in source code form is functional rather than expressive and therefore not protected speech); *Karn v. United States Dept. of State,* 925 F.Supp. 1, 9 n. 19 (D.D.C.1996) (assuming that source code is protected speech when joined with commentary, but stating that source code alone is "merely a means of commanding a computer to perform a function"); R. Polk Wagner, *The Medium Is the Mistake: The Law of Software for the First Amendment,* 51 Stan.L.Rev. 387 (1999) (arguing that focus of analysis in software cases should be on whether government interests

ertheless, this Court assumes for purposes of this motion, although it does not decide, that even the executable code is sufficiently expressive to merit some constitutional protection. That, however, is only the beginning of the analysis.

### a. Constitutionality of the DMCA

As some commentators have said, "Copyright law restricts speech: it restricts you from writing, painting, publicly performing, or otherwise communicating what you please."[31] And though it might conceivably be argued that the First Amendment, which was adopted after the ratification of the Constitution itself, trumped the Copyright Clause and forbids all restraint or punishment of copyright infringement,[32] this argument has been rejected by the Supreme Court, which views the Bill of Rights and the original Constitution as a single instrument and has made it unmistakably clear that the First Amendment does not shield copyright infringement.[33] Indeed, copyright is an "engine of free expression" because it "supplies the economic incentive to create and disseminate ideas."[34] To the extent there is any tension between free speech and protection of copyright, the Court has found it to be accommodated fully by traditional fair use doctrine,[35] with expression prohibited by the Copyright Act and not

within the fair use exception considered unprotected by the First Amendment.[36]

The conclusion that copyright infringement may be proscribed consistently with the First Amendment does not end the inquiry, however. This case concerns the DMCA rather than the older aspects of the Copyright Act. The DMCA sweeps more broadly by prohibiting production and dissemination of technology that can circumvent measures taken to protect copyright, not merely infringement of copyright itself. It is a prophylactic measure. In consequence, further First Amendment analysis of the DMCA is warranted. Nevertheless, the DMCA appears to be a legitimate exercise of Congress' power.

The Copyright Clause empowers Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors . . . the exclusive Right to their respective Writings. . . ."[37] The Necessary and Proper Clause further provides that Congress may "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers. . . ."[38] Hence, the Necessary and Proper Clause grants Congress the power to do that which is necessary and proper to prevent others from publishing protected writings for the duration of the copyright.

supporting regulation are related to suppression of expression, not on whether code itself is intended to be or understood as expressive); Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases*, 48 Duke L.J. 147, 236–37 (1998) ("most executable software is best treated as a virtual machine rather than as protected expression").

**31.** Lemley & Volokh, *supra*, 48 Duke L.J. at 165–66.

**32.** This argument is posited by the Nimmers, who nevertheless do not embrace it. *See* 1 Nimmer § 1.10[A], at 1–66.44 to 1–66.45 (1999).

**33.** *See generally Harper & Row Publishers Inc. v. Nation Enterprises*, 471 U.S. 539, 555–60, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

**34.** *Id.* at 558, 105 S.Ct. 2218.

**35.** *See id.* at 560, 105 S.Ct. 2218. *See also Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 95 (2d Cir.1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978) ("Conflicts between interests protected by the first amendment and the copyright laws thus far have been resolved by application of the fair use doctrine."); *Nihon Keizai Shimbun Inc. v. Comline Business Data, Inc.*, 166 F.3d 65, 74 (2d Cir.1999).

**36.** *See, e.g., Nihon Keizai Shimbun*, 166 F.3d at 74.

**37.** U.S. Const., art. I, § 8.

**38.** *Id.*

The scope of Congress' power under the Necessary and Proper Clause is broad. As Chief Justice Marshall wrote in *McCulloch v. Maryland*,[39] "Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited but consistent with the letter and spirit of the constitution, are constitutional."[40] Moreover, the Supreme Court has made clear that Congress should be accorded substantial deference in determining how best to protect copyright in an age of rapid technological change.[41]

In enacting the DMCA, Congress found that the restriction of technologies for the circumvention of technological means of protecting copyrighted works "facilitate[s] the robust development and world-wide expansion of electronic commerce, communications, research, development, and education" by "mak[ing] digital networks safe places to disseminate and exploit copyrighted materials."[42] That view can not be dismissed as unreasonable. Section 1201(a)(2) of the DMCA therefore is a proper exercise of Congress' power under the Necessary and Proper Clause.

▮ This conclusion might well dispose of defendants' First Amendment challenge. Given Congress' justifiable view that the DMCA is instrumental in carrying out the objective of the Copyright Clause, there arguably is no First Amendment objection to prohibiting the dissemination of means for circumventing technological methods for controlling access to copyrighted works. But the Court need not rest on this alone.

In determining the constitutionality of governmental restriction on speech, courts traditionally have balanced the public interest in the restriction against the public interest in the kind of speech at issue.[43] This approach seeks to determine, in light of the goals of the First Amendment, how much protection the speech at issue merits. It then examines the underlying rationale for the challenged regulation and assesses how best to accommodate the relative weights of the interests in free speech interest and the regulation.[44]

As Justice Brandeis wrote, freedom of speech is important both as a means to achieve a democratic society and as an end in itself.[45] Further, it discourages social

**39.** 4 Wheat. (17 U.S.) 316, 4 L.Ed. 579 (1819).

**40.** *Id.* at 421.

**41.** *See Sony Corp. of America v. Universal City Studios*, 464 U.S. 417, 434, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) ("Sound policy, as well as history, supports or consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology.").

**42.** S.Rep. No. 105–190, 105th Cong., 2d Sess. (1998).

**43.** 1 Nimmer §§ 1.10[A]–1.10[B][1], at 1–66.45 to 1–74. This "definitional balancing" is to be distinguished from "ad hoc balancing," which seeks to balance only the particular interests of the parties before the court, rather than the more general public interests in the

kind of speech and the governmental regulation at issue. According to the Nimmers, ad hoc balancing has proven unsatisfactory and generally has been replaced by the definitional balancing method. *Id.* § 1.10[A], at 1–67. *See also Konigsberg v. State Bar of Calif.*, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961).

**44.** This kind of balancing has been utilized in cases involving *inter alia* obscenity, privacy, and libel. 1 Nimmer § 1.10[A], at 1–68 (citing *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (obscenity); *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (privacy); *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (libel)).

**45.** *Whitney v. California*, 274 U.S. 357, 375, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J. concurring) (cited in 1 Nimmer § 1.10[B], at 1–72 to 1–73). *See also Nixon v. Shrink Missouri Gov't PAC*, —— U.S. ——, 120 S.Ct. 897, 911, 145 L.Ed.2d 886 (2000) (Breyer, J., concurring); *Wallace v. Jaffree*, 472 U.S. 38, 48, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); *Mills*

violence by permitting people to seek redress of their grievances through meaningful, non-violent expression.[46] These goals have been articulated often and consistently in the case law.

The computer code at issue in this case does little to serve these goals. Although this Court has assumed that DeCSS has at least some expressive content, the expressive aspect appears to be minimal when compared to its functional component.[47] Computer code primarily is a set of instructions which, when read by the computer, cause it to function in a particular way, in this case, to render intelligible a data file on a DVD. It arguably "is best treated as a virtual machine...."[48]

On the other side of this balance lie the interests served by the DMCA. Copyright protection exists to "encourage individual effort by personal gain"[49] and thereby "advance public welfare"[50] through the "promot[ion of] the Progress of Science and useful Arts."[51] The DMCA plainly was designed with these goals in mind. It is a tool to protect copyright in the digital age. It responds to the risks of technological circumvention of access controlling mechanisms designed to protect copyrighted works distributed in digital form. It is designed to further precisely the goals articulated above, goals of unquestionably high social value.

This is quite clear in the specific context of this case. Plaintiffs are eight major motion picture studios which together are largely responsible for the development of the American film industry. Their products reach hundreds of millions of viewers internationally and doubtless are responsible for a substantial portion of the revenue

in the international film industry each year. To doubt the contribution of plaintiffs to the progress of the arts would be absurd. DVDs are the newest way to distribute motion pictures to the home market, and their popularity is growing rapidly. The security of DVD technology is central to the continued distribution of motion pictures in this format. The dissemination and use of circumvention technologies such as DeCSS would permit anyone to make flawless copies of DVDs at little expense.[52] Without effective limits on these technologies, copyright protection in the contents of DVDs would become meaningless and the continued marketing of DVDs impractical. This obviously would discourage artistic progress and undermine the goals of copyright.

The balance between these two interests is clear. Executable computer code of the type at issue in this case does little to further traditional First Amendment interests. The DMCA, in contrast, fits squarely within the goals of copyright, both generally and as applied to DeCSS. In consequence, the balance of interests in this case falls decidedly on the side of plaintiffs and the DMCA.

b. *Distribution of DeCSS as Part of a Course of Conduct in Violation of Law*

Application of the DMCA to prohibit posting of DeCSS appears constitutional also because that posting is part of a course of conduct the clear purpose of which is the violation of law.

This line of reasoning first was articulated by the Supreme Court in *Giboney v. Empire Storage & Ice Co,*[53] where the

*v. Alabama,* 384 U.S. 214, 218–19, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966).

46. *Id.*

47. *Junger,* 8 F.Supp.2d at 715–18; *Karn,* 925 F.Supp. at 9 n. 19; Lemley & Volakh, 48 DUKE L.J. at 236–37.

48. Lemley & Volakh, 48 DUKE L.J. at 236–37.

49. *Mazer v. Stein,* 347 U.S. 201, 219, 74 S.Ct. 460, 98 L.Ed. 630 (1954).

50. *Id.*

51. U.S. CONST. art. II, § 8.

52. Schumann Decl. ¶¶ 4–5.

53. 336 U.S. 490, 498, 69 S.Ct. 684, 93 L.Ed. 834 (1949).

Court upheld an injunction against peaceful picketing by union members despite the contention that the picketers were attempting only to publicize truthful facts about a labor dispute. Although labor picketing traditionally enjoys First Amendment protection, the Court declined to extend such protection in *Giboney* on the ground that the picketing was integral to a course of conduct in violation of a valid criminal statute prohibiting restraint of trade.[54] The Court warned that, as a general matter, the government "cannot consistently with our Constitution abridge [First Amendment] freedoms to obviate slight inconveniences or annoyances,"[55] but found that where the allegedly protected speech is "used as an essential and inseparable part of a grave offense against an important public law," it shall not be "immunize[d] ... from state control."[56] The Court held further that "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed."[57] This principle has been applied in both criminal and non-criminal contexts as long as the offense in question is defined by a valid statutory scheme promoting an important public interest.[58]

As has been discussed already, it no longer is open to doubt that the First Amendment does not shield copyright infringement. The fundamental purpose of DeCSS is to circumvent the technological means, CSS, that ensures that the exclusive rights of the holders of copyright in DVD movies—including importantly the exclusive right to make copies—are protected against infringement. Even assuming that some would use DeCSS only to view copyrighted motion pictures which they lawfully possessed, and thus arguably not infringe plaintiffs' copyrights, the record clearly demonstrates that the chief focus of those promoting the dissemination of DeCSS is to permit widespread copying and dissemination of unauthorized copies of copyrighted works. The dissemination of DeCSS therefore is the critical component of a course of conduct, the principal object of which is copyright infringement. That DeCSS arguably is expressive to some degree does not alter that reality. In light of *Giboney* and its progeny, defendants cannot latch onto the expressive aspect in order to shield a key aspect of a chain of events, the main purpose of which is unlawful. Application of the DMCA to prohibit production and dissemination of DeCSS therefore does not violate the First Amendment.

### c. Vagueness

■■■ Defendants contend summarily that the DMCA is "vague on its face and as applied."[59] It is settled in this circuit that a party who "engages in some conduct that is clearly proscribed [by the chal-

---

**54.** *Id.* at 498, 69 S.Ct. 684.

**55.** *Id.* at 501–02, 69 S.Ct. 684.

**56.** *Id.* at 502, 69 S.Ct. 684.

**57.** *Id.*

**58.** *See, e.g., Hughes v. Superior Court,* 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950) (injunction against picketing to secure compliance with demand that store adopt race-based hiring policy on ground that it contravenes state policy against involuntary employment on racial lines); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 93 S.Ct. 2553, 37

L.Ed.2d 669 (1973) (injunction against newspaper's furtherance of illegal sex discrimination by placing of job advertisements in gender-designated columns); *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (injunction under Sherman Act against professional association's adoption of official opinions, policy statements or guidelines implying that competitive bidding was unethical); *NLRB v. Local No. 3,* 828 F.2d 936 (2d Cir.1987) (injunction against union's threat to strike as violation of National Labor Relations Act's prohibition on unfair labor practices).

**59.** Def.Mem. at 13.

lenged statute] cannot complain of the vagueness of the law as applied to the conduct of others." [60] The record in this case strongly supports the contention that defendants' conduct fits comfortably within the statute. In consequence, defendants' claim of vagueness is frivolous.

### d. Overbreadth

Defendants allege that the DMCA is overbroad in that it "unquestionably attaches sanctions to protected conduct" and exerts clear "chilling effects" by restricting dissemination of protected computer code, limiting the rights of users to receive this code, and curtailing the rights of all Linux users to decrypt DVDs.[61]

In order to challenge a statute on overbreadth grounds, a party first must show that the enactment reaches a "substantial amount of constitutionally protected conduct." [62] Defendants have not done

so here. The claim of overbreadth therefore fails.

### 4. Prior Restraint

Few phrases are as firmly rooted in our constitutional jurisprudence as the maxim that "[a]ny system of prior restraints of expression comes to [a] Court bearing a heavy presumption against its constitutional validity." [63] Yet there is a significant gap between the rhetoric and the reality. Courts often have upheld restrictions on expression that many would describe as prior restraints,[64] sometimes by characterizing the expression as unprotected [65] and on other occasions finding the restraint justified despite its presumed invalidity.[66] Moreover, the prior restraint doctrine, which has expanded far beyond the Blackstonian model [67] that doubtless informed the understanding of

**60.** *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

**61.** Def.Mem. at 13.

**62.** *Village of Hoffman Estates*, 455 U.S. at 494, 102 S.Ct. 1186.

**63.** *New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963)).

**64.** *See, e.g., Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986) (upholding restrictions on casino gambling advertising); *Times Film Corp. v. Chicago*, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961) (upholding local ordinance requiring review of films by municipal officials as prerequisite to issuance of permits for public screening); *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir.) (enjoining biographer's use of subject's unpublished letters as copyright infringement), *cert. denied*, 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987); *Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir.1979) (enjoining distribution of film on ground that actresses' uniforms infringed plaintiff's trademark). *See generally* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 12–36, at 1045–46 (1988) (hereinafter TRIBE).

**65.** *See, e.g., Charles of the Ritz Group, Ltd. v. Quality King Distributors, Inc.*, 832 F.2d 1317 (2d Cir.1987) (upholding injunction against commercial slogan on ground that slogan created a likelihood of confusion and is therefore "beyond the protective reach of the First Amendment"); *Vondran v. McLinn*, No. 95–20296, 1995 WL 415153, *6 (N.D.Cal. July 5, 1995) (enjoining defendant's false and disparaging remarks regarding plaintiff's patented process for making fiber reinforced concrete on the ground that the remarks are not protected by the First Amendment).

**66.** *See, e.g., Times Film Corp. v. Chicago*, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961) (upholding local ordinance requiring review by city officials of all films as a prerequisite to grant of permit for public screening despite concerns of First Amendment violations); *Posadas de Puerto Rico Assoc.*, 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (upholding restrictions on advertising despite finding that the advertising fell within ambit of First Amendment); *Dallas Cowboys Cheerleaders, Inc.*, 604 F.2d 200 (enjoining distribution of film for trademark infringement despite claim that injunction violated distributor's First Amendment rights).

**67.** 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 151–52 (1769).

the Framers of the First Amendment,[68] has been criticized as filled with "doctrinal ambiguities and inconsistencies result[ing] from the absence of any detailed judicial analysis of [its] true rationale" [69] and, in one case, even as "fundamentally unintelligible." [70] Nevertheless, the doctrine has a well established core: administrative preclearance requirements for and preliminary injunctions against speech as conventionally understood are presumptively unconstitutional. Yet that proposition does not dispose of this case.

The classic prior restraint cases were dramatically different from this one. *Near v. Minnesota*[71] involved a state procedure for abating scandalous and defamatory newspapers as public nuisances. *New York Times Co. v. United States*[72] dealt with an attempt to enjoin a newspaper from publishing an internal government history of the Vietnam War. *Nebraska Press Association v. Stuart*[73] concerned a court order barring the reporting of certain details about a forthcoming murder case. In each case, therefore, the government sought to suppress speech at the very heart of First Amendment concern—expression about public issues of the sort that is indispensable to self government. And while the prior restraint doctrine has been applied well beyond the sphere of political expression, we deal here with something new altogether—computer code, a fundamentally utilitarian construct even assuming it embodies some expressive element. Hence, it would be a mistake simply to permit its assumed expressive element to drive a characterization of the code as speech no different from the Pentagon Papers, the publication of a newspaper, or the exhibition of a motion picture and then to apply prior restraint rhetoric without a more nuanced consideration of the competing concerns.

In this case, the considerations supporting an injunction barring the posting of DeCSS pending a trial on the merits are very substantial indeed. Copyright and, more broadly, intellectual property piracy are endemic, as Congress repeatedly has found.[74] The interest served by prohibiting means that facilitate such piracy—the protection of the monopoly granted to copyright owners by the Copyright Act—is of constitutional dimension. There is little room for doubting that broad dissemina-

---

**68.** *See Pittsburgh Press Co.*, 413 U.S. at 390, 93 S.Ct. 2553.

**69.** Martin H. Redish, *The Proper Role of the Prior Restraint Doctrine in First Amendment Theory*, 70 Va.L.Rev. 53, 54 (1983) (hereinafter "Redish"). *See also* Tribe § 12–34, at 1040–41 (2d ed.1988).

**70.** John Calvin Jeffries, Jr., *Rethinking Prior Restraint*, 92 Yale L.J. 409, 419 (1983).

**71.** 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

**72.** 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822.

**73.** 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

**74.** *See* H.R.Rep. 106–216, 106th Cong., 1st Sess. (1999) ("Notwithstanding [penalties for copyright infringement] copyright piracy of intellectual property flourishes, assisted in large part by today's world of advanced technologies. For example, industry groups estimate that counterfeiting and piracy of computer software cost the affected copyright holders more than $11 billion last year (others believe the figure is closer to $20 billion). In some countries, software piracy rates are as high as 97% of all sales. The U.S. rate is far lower (25%), but the dollar losses ($2.9 billion) are the highest worldwide. The effect of this volume of theft is substantial: lost U.S. jobs, lost wages, lower tax revenue, and higher prices for honest purchasers of copyrighted software. Unfortunately, the potential for this problem to worsen is great."); S.Rep. 106–140, 106th Cong., 1st Sess. (1999) ("Trademark owners are facing a new form of piracy on the Internet caused by acts of 'cybersquatting.' "); S.Rep. 105–190, 105th Cong., 2d Sess. (1998) ("Due to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy."); H.R.Rep. 105–339, 105th Cong., 1st Sess. (1997) ("[C]opyright piracy flourishes in the software world.").

tion of DeCSS would seriously injure or destroy plaintiffs' ability to distribute their copyrighted products on DVDs and, for that matter, undermine their ability to sell their products to the "home video" market in other forms. The potential damages probably are incalculable, and these defendants surely would be in no position to compensate plaintiffs for them if plaintiffs were remitted only to *post hoc* damage suits.

On the other side of the coin, the First Amendment interests served by the dissemination of DeCSS prior to a trial on the merits are minimal. The fact that there may be some expressive content in the code should not obscure the fact that its predominant character is no more expressive than an automobile ignition key—it is simply a means, electronic in one case and mechanical in the other, of causing the machine with which it is used to function in a particular way. Hence, those of the traditional rationales for the prior restraint doctrine that relate to inhibiting the transmission and receipt of ideas are of attenuated relevance here, even assuming that skilled programmers might learn something about encryption from studying the DeCSS code. Indeed, even academic commentators who take the extreme position that most preliminary injunctions in intellectual property cases are unconstitutional prior restraints concede that there is no First Amendment obstacle to preliminary injunctions barring distribution of copyrighted computer object code or restraining the construction of a new build-

ing based on copyrighted architectural drawings because the functional aspects of these types of information are "sufficiently nonexpressive." [75]

To be sure, there is much to be said in most circumstances for the usual procedural rationale for the prior restraint doctrine: prior restraints carry with them the risk of erroneously suppressing expression that could not constitutionally be punished after publication.[76] In this context, however, that concern is not fully persuasive, both because the enjoined expressive element is minimal and because of the procedural context of the case. This injunction was issued only on a finding, after an adversarial proceeding, that plaintiffs have a very strong likelihood of ultimate success on the merits.[77] The Court offered (and defendants thus far have declined) a virtually immediate trial on the merits, thus ensuring that the duration of the restraint prior to a final determination will be as brief as defendants wish.[78] Hence, even assuming that preliminary injunctions that affect expression even incidentally to the regulation of other action should be granted only on the clearest showing after an adversary hearing and where the party enjoined may promptly obtain a final determination on the merits, those *requirements* have been satisfied here.

Accordingly, the Court holds that the prior restraint doctrine does not require denial of the preliminary injunction in this case.[79]

---

**75.** Lemley & Volokh, 48 Duke L.J. at 210 & n. 275.

**76.** *See, e.g., Pittsburgh Press Co.,* 413 U.S. at 390, 93 S.Ct. 2553 ("The special vice of a prior restraint is that communication will be suppressed ... before an adequate determination that *it is unprotected by the First Amendment.*"); Lemley & Volokh, 48 Duke L.J. at 200–02, 211; *see* Redish, 70 Va.L.Rev. at 75–83.

**77.** *See* Lemley & Volokh, 48 Duke L.J. at 211–12, 215 (acknowledging that high likelihood of success diminishes risk of erroneous suppression of protected speech).

**78.** *See Freedman v. Maryland,* 380 U.S. 51, 59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

**79.** As the Court has found a strong likelihood of success on the merits, it is not necessary to analyze the balance of hardships. Nonetheless, were such analysis appropriate, the Court would find the balance to tip decidedly in plaintiffs' favor. Were the injunction erroneously granted, defendants would risk a delay in their ability to make DeCSS available on their Web sites. As they have made no claim that dissemination of DeCSS is particularly time sensitive, the Court finds this risk to be relatively benign. In contrast, were the injunction wrongly denied, plaintiffs would

## Conclusion

For the foregoing reasons, the Court granted plaintiffs' motion for a preliminary injunction and entered such an order on January 20, 2000. The foregoing, together with those made on the record on that date, constitute the Court's findings of fact and conclusions of law.

SO ORDERED.

face a choice between continued infringement of their copyrights as a result of illegal DVD decryption or voluntary deferral of release of DVDs until the matter is fully litigated as well as the cannibalization of the market for their products via other media. Either option likely would result in substantial economic losses for plaintiffs.